**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| OUR LADY'S INN, a Missouri nonprofit corporation, | ) ) ) |
| ARCHDIOCESAN ELEMENTARY SCHOOLS OF THE ARCHDIOCESE OF ST. LOUIS, a Missouri nonprofit corporation, | ) ) ) ) ) |
| O'BRIEN INDUSTRIAL HOLDINGS, LLC, a Missouri limited liability company, | ) ) ) |
| and | ) ) |
| FRANK ROBERT O'BRIEN JR., a Missouri resident, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CITY OF ST. LOUIS, a Missouri constitutional charter city, | ) ) ) |
| Defendant. | ) ) |

Case No.

**COMPLAINT**

Plaintiffs Our Lady's Inn, Archdiocesan Elementary Schools of the Archdiocese of St. Louis (operating St. Louis Catholic Academy, Most Holy Trinity Academy, St. Cecilia School and Academy, and St. Louis the King at the Cathedral School), O'Brien Industrial Holdings, LLC and Frank Robert O'Brien Jr., by and through their attorneys, state as follows:

**Nature of the Action**

1.       Plaintiffs seek judicial review of City of St. Louis Ordinance 70459 (also known as Board Bill 203 Committee Substitute), which violates Plaintiffs' rights under the United States Constitution and various Missouri statutes.

2.      Ordinance 70459 was approved by the City of St. Louis Board of Aldermen on February 10, 2017, and took effect on or about February 13, 2017.

3.      Ordinance 70459 was represented as addressing discrimination in employment, housing and realty against individuals who have had, or are planning to have, abortions. Proponents and sponsors of the Ordinance, however, were unable to point to the actual occurrence of any such discrimination in the City of St. Louis.

4.      Ordinance 70459 is accordingly a remedy in search of a problem.

5.      While its proponents have been unable to identify past or present problems addressed by Ordinance 70459, the vague and sweeping scope of the Ordinance creates problems for others, including conflicts with the First and Fourteenth Amendments to the U.S. Constitution and various provisions of Missouri law.

6.      Up until now, the City of St. Louis has prohibited discrimination based on the familiar categories of "race, color, age, religion, sex, familial status, disability, sexual orientation, national origin or ancestry." To this list, Ordinance 70459 adds a new protected class based not on immutable characteristics or a class of persons historically subject to social opprobrium, but rather on conduct involving willful choice: those who have made or expect to make "reproductive health decision[s]."

7.      Ordinance 70459 defines a "reproductive health decision" in language that is both sweeping and not easily comprehended. It defines "reproductive health decision" as "any decision related to the use or intended use of a particular drug, device, or medical service related to reproductive health, including the use or intended use of contraception or fertility control or the planned or intended initiation or termination of a pregnancy." This definition goes well beyond an individual woman's decision to have an abortion. It includes "any decision," by

anyone, that is "related to" abortion. The pregnancy terminated or to be terminated may be a woman's own or it may be the pregnancy of a spouse, a friend, or anyone. It is not required that the person complaining of discrimination even know the pregnant woman.

8.     The newly protected class created by Ordinance 70459 thus includes, among others, abortion activists, advocates and providers, all of whom have made "decision[s] related to" abortion. Ordinance 70459 forbids Plaintiffs and others from making adverse employment, housing or realty decisions based on an individual or entity being an abortion activist, advocate or provider.

9.     The City of St. Louis deliberately placed in this new protected class those who have made or are about to make a decision related to abortion, even when the abortion is not their own. In forbidding employment discrimination, the Ordinance refers only to protected "individuals" or "employees." In forbidding discrimination in housing or sale or lease of realty, the Ordinance places in a protected class not only "individuals" but also "persons," which it defines to include corporations and all other kinds of business organizations. Thus, the Ordinance forbids Plaintiffs from refusing to sell or rent real property to individuals and corporate organizations that promote or provide abortions.

10.     Ordinance 70459 expressly forbids constitutionally protected speech, barring employers, as well as persons selling or leasing real property or offering housing, from printing or publishing any statement which expresses "any preference, limitation, specification or discrimination because of reproductive health decisions . . . ." Sections Two (B)(5) and Two (C)(1)(f). These are "speech codes" that violate the First Amendment's guarantees of freedom of speech and freedom of association.

11.     The Ordinance includes a limited religious exemption that applies to a narrow category of religious objectors. The exemption applies to "religious institution[s], corporation[s], association[s], societ[ies], health care facilit[ies] [and] educational institution[s] with historic religious affiliation" (religious organizations), without further defining what those terms mean. Under the exemption, these religious organizations are not required to allow "the provision of any reproductive health service on property owned or leased by [the organization]" and are not required to "provide or pay for any reproductive health service to any patient, student or employee" or "provide health insurance coverage to any employee for any reproductive health service." Sections Two (B)(6) and Two (C)(1)(j). However, *individuals* with sincere religious, moral or ethical objections to abortion are not exempt in any way. Organizations that do not qualify as religious organizations, even if their sole mission is to provide alternatives to abortion, are granted no exemptions whatsoever.

12.     Even as to qualifying religious organizations, the exemptions for both employment and housing and realty are limited in scope. The Ordinance permits qualified religious organizations only to: (1) refuse to allow abortions and other reproductive services on their property; (2) avoid paying for abortions and other reproductive services; and (3) avoid providing health insurance coverage to others for abortions and other reproductive services. Accordingly, religious organizations are not entirely exempt from the Ordinance's constraints on employment decisions or decisions related to housing or sale or rental of real property.

13.     Plaintiffs believe abortion destroys the life of an unborn child.

14.     Plaintiffs oppose abortion as a matter of sincerely held religious beliefs. Our Lady's Inn, for instance, has the mission of serving as an alternative to abortion for women with crisis pregnancies. Ordinance 70459 affects Our Lady's Inn both as an employer and as an entity

4

that houses employees, pregnant women and new mothers. The Ordinance prohibits Our Lady's Inn from employing only individuals who oppose abortion. The Ordinance requires Our Lady's Inn to house women who intend to have or do have abortions. Our Lady's Inn exists to help women avoid abortion. Our Lady's Inn receives money from the State of Missouri precisely to help women avoid abortion.

15.     Archdiocesan Elementary Schools require that their teachers and other employees sign a "Witness Statement" attesting that they will not publicly support abortion and will otherwise live in harmony with the teachings of the Catholic faith both in their professional and personal lives. The Ordinance forbids requiring such a statement and promises a criminal fine for organizations, and a fine and jail time for individuals, who effectuate the Witness Statement and other pro-life policies of the Catholic Church and Archdiocesan Elementary Schools.

16.     The Ordinance specifically exempts some religious organizations from having to provide health insurance for abortion, but it forces non-exempt parties, including O'Brien Industrial Holdings, LLC and Frank Robert O'Brien Jr., to cover abortions in their employee health care plans. This mandate violates the federal Equal Protection Clause as well as Missouri law. *See* Mo. Rev. Stat. 191.724, 376.805.1. Further, the Ordinance's limited exemption for religious organizations is also impermissibly vague, in that it is unclear whether it covers Our Lady's Inn or similar entities. It is therefore unclear whether the Ordinance requires Our Lady's Inn to provide abortion coverage.

17.     The Ordinance's new protected class goes beyond the scope of Missouri's Human Rights Act, Chapter 213. Indeed, it contravenes Missouri law. In 2007, Missouri established an "Alternatives to Abortion Program." Mo. Rev. Stat. 188.325. In 1986, Missouri provided that "[i]t is the intention of the general assembly of the state of Missouri to grant the right to life to all

humans, born and unborn, and to regulate abortion to the full extent permitted by the Constitution of the United States, decisions of the United States Supreme Court, and federal statutes." Mo. Rev. Stat. 188.010.

18. The City of St. Louis enacted Ordinance 70459 with knowledge that it would coerce religious employers, as well as other pro-life individuals and organizations, to violate their sincerely held religious beliefs, their pro-life missions, or both, which beliefs and missions not only align with state law but are in some cases specifically authorized and funded by the State of Missouri.

19. Ordinance 70459 prevents Plaintiffs—religious institutions, faith-based employers and pro-life organizations—from making employment and housing and real estate decisions consistent with their institutional missions and sincere moral and religious beliefs about human life. Ordinance 70459 denies religious and pro-life organizations the right to practice their faith, to freely associate around a common cause, to speak freely, and to be true to their missions.

20. Ordinance 70459 makes organizations with offices or staff within the City vulnerable to numerous and costly lawsuits when an employee or applicant for employment claims that he or she was passed over for promotion, reprimanded, or not hired because of a "reproductive health decision" such as publicly advocating, promoting, participating in or providing abortions. This exposure compels Plaintiffs to censor their opposition to abortion rather than risk expensive litigation.

21. Plaintiffs therefore seek relief in this Court to protect the most fundamental of American rights. They ask for declaratory and injunctive relief to remedy the City of St. Louis's

on-going violations of Plaintiffs' freedom of speech, freedom of association, religious freedom, and other rights secured by the U.S. Constitution and various Missouri laws.

## Jurisdiction and Requested Relief

22.     This is an action for declaratory and injunctive relief under 28 U.S.C. 1331, 1343(a)(4), 2201 and 2202, and in accord with Federal Rules of Civil Procedure 57 and 65.

23.     Plaintiffs seek redress for federal constitutional violations pursuant to 42 U.S.C. 1983.

24.     This Court has supplemental jurisdiction to grant relief on state claims under 28 U.S.C. 1367.

## Parties

**Our Lady's Inn**

25.     Plaintiff Our Lady's Inn is a Missouri nonprofit corporation with its principal place of business in the City of St. Louis, Missouri. It is tax exempt under Section 501(c)(3) of the U.S. Internal Revenue Code.

26.     Our Lady's Inn provides housing, counseling, perinatal nursing support, employment readiness and training opportunities, sober living support and additional services to pregnant women in difficult circumstances. It also provides rental units to some on-site employees.

27.     Our Lady's Inn was organized in September of 1980 as a Missouri nonprofit corporation.

28.     In 1982, Our Lady's Inn opened its doors in South St. Louis to provide a safe and loving home for pregnant women who felt that they had no alternative to abortion. The current home can accommodate 18 families. It is usually filled to capacity with a waiting list.

29.     Our Lady's Inn also operates a four-family flat in the City of St. Louis that provides transitional housing for women who have given birth and are either working, attending school, or in a job training program. Our Lady's Inn operates "Twice Blessed Resale Shop," which provides job experience and training for the women residing at Our Lady's Inn.

30.     When a family leaves the home, Our Lady's Inn offers them two years of "aftercare" case management.

31.     Our Lady's Inn openly and explicitly provides its services to women solely as an alternative to abortion. Women who plan to have abortions, or who have recently procured abortions, may not reside at Our Lady's Inn.

32.     Our Lady's Inn is part of, and its mission is consistent with, Missouri's Alternatives to Abortion Program, a program established in 2007 through Mo. Rev. Stat. 188.325. The Alternatives to Abortion Program assists low-income pregnant women in carrying their unborn children to term instead of having abortions, and then in caring for their newborn children or placing them for adoption. The program provides services and counseling during pregnancy and for up to one year following birth. Governor Greitens has recommended a budget of $6,458,561 for the program for fiscal year 2018.

33.     Our Lady's Inn leases living space to women who are on-site employees and serve as supervisors of residents. It also provides living space for the use and enjoyment of women and their children during pregnancy and for up to a year after birth.

34.     Our Lady's Inn has more than six employees in the City of St. Louis and is thus subject to the employment nondiscrimination section of the Ordinance.

**Archdiocesan Elementary Schools of the Archdiocese of St. Louis**

35.     Plaintiff Archdiocesan Elementary Schools of the Archdiocese of St. Louis

(Archdiocesan Elementary Schools) is a Missouri nonprofit corporation with its principal place of business in the City of St. Louis, Missouri.

36.     Archdiocesan Elementary Schools is a group of Archdiocesan elementary schools administered by the Catholic Education Office and governed by the Archdiocesan Board of Catholic Education. The school principals report directly to the Associate Superintendent for Elementary School Administration of the Archdiocese of St. Louis.

37.     Archdiocesan Elementary Schools operates four elementary schools within the City of St. Louis: St. Louis Catholic Academy, Most Holy Trinity Catholic School and Academy, St. Cecilia School and Academy, and St. Louis the King School at the Cathedral (which is currently operating but will soon cease operations and combine with the other three schools).

38.     Archdiocesan Elementary Schools' four elementary schools serve economically disadvantaged families within nearby parishes that are unable to provide a sufficient parish subsidy to sustain a school independently. The Archdiocese of St. Louis conducts its educational mission through such primary and secondary schools. The first Catholic school opened in St. Louis in 1818. These schools welcome students in all financial conditions, from all backgrounds, and of any or no faith.

39.     Archdiocesan Elementary Schools is dedicated to teaching the underserved. In 1947, as one of Archbishop Joseph E. Ritter's first acts upon arrival in St. Louis, he instructed all pastors in the Archdiocese to end racial segregation in the parochial schools. It would be several more years before the United States Supreme Court would follow suit for the nation's public schools. Today, the Archdiocesan Elementary Schools exemplify the Catholic Church's dedication to teaching urban, minority and non-Catholic youth.

40.     Archdiocesan Elementary Schools is a religious institution. It is a Missouri nonprofit corporation organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the U.S. Internal Revenue Code.

41.     Archdiocesan Elementary Schools' activities must be in accord with the Canons of the Catholic Church.

42.     Under Canon Law, a diocesan bishop must see to it that Christian schools are available, or if they are not, to take care that they are established. Canon 802, Sec. 1.

43.     Catholic religious instruction and education imparted in schools are subject to the authority of the diocesan bishop. Canon 804, Sec. 1. This includes the authority to appoint or approve teachers of religion and to remove them or direct that they be removed if required for religious or moral reasons. Canon 805.

44.     Most Reverend Robert J. Carlson as archbishop of St. Louis and president of the Archdiocesan Elementary Schools is required by Canon Law to ensure that teachers of religious instruction in its schools are outstanding in correct doctrine, their witness of a Christian life, and teaching skills. Canon 804, Sec. 2.

45.     Archdiocesan Elementary Schools employs approximately 25 religious educators, who must be either certified or in the process of obtaining certification as religion teachers by the Religious Education Department of the Catholic Education Office of the Archdiocese of St. Louis. Educators seeking this certification must hold a bachelor's degree with at least twelve credit hours in specified theology and religious education courses from a Catholic college, university or institute.

46.     Archdiocesan Elementary Schools requires that its employees, upon application for employment, sign a Witness Statement attesting that they respect ecclesiastical authority, will

not take a public position contrary to the Catholic Church, and will conduct their lives in a manner consistent with the teachings of the Catholic Church. This requirement is imposed by the Archbishop of St. Louis under his reserved powers as a member of Archdiocesan Elementary Schools. The Catholic Church's longstanding and widely known opposition to abortion is embraced by the Witness Statement. Since the first century, the teachings of the Catholic Church have affirmed the moral evil of every procured abortion. Catechism of the Catholic Church 2271.

47.     The Catholic Education Office is currently in the process of hiring, and renewing presently employed, religious educators whose annual contracts begin on or about August 1, 2017.  For this and other reasons, time is of the essence in this matter.

48.     Archdiocesan Elementary Schools has more than six employees in the City of St. Louis and thus is subject to the employment nondiscrimination section of the Ordinance.

**O'Brien Industrial Holdings, LLC and Frank Robert O'Brien Jr.**

49.     O'Brien Industrial Holdings, LLC (O'Brien Industrial Holdings) is a Missouri limited liability company with its principal place of business in the City of St. Louis, Missouri. Frank Robert O'Brien Jr. (Frank O'Brien), an individual and a citizen of the State of Missouri, is Chairman and Managing Member of O'Brien Industrial Holdings. O'Brien Industrial Holding is a closely held company, and Frank O'Brien is the principal owner.

50.     Frank O'Brien holds the sole voting interest in O'Brien Industrial Holdings. O'Brien Industrial Holdings is the holding company for and owner of the Christy family of companies: Christy Catalytics, LLC; Christy Industrial Services Co., LLC; Christy Minerals Company, LLC; The Christy Refractories Company, LLC; and O'Brien Asset Management, LLC.

51.     Frank O'Brien, as Chairman and Managing Member of O'Brien Industrial

Holdings, is responsible for setting all policies governing the conduct of all phases of the business of O'Brien Industrial Holdings and the Christy family of companies.

52.   O'Brien Industrial Holdings, through its subsidiaries, is engaged in the exploration, mining and processing of refractory and ceramic raw materials (Christy Minerals); the manufacturing and distribution of refractory and insulation products (Christy Refractories); the installation of refractory products for all types of industries (Christy Industrial); and the supplying of ceramic and alumina balls to over 40 countries, as well as mass transfer media for the hydrocarbon and chemical processing industries (Christy Catalytics).

53.   O'Brien Industrial Holdings has its main offices at 4641 McRee Avenue in the City of St. Louis. Prominently displayed in the company's lobby is a statue of the Sacred Heart of Jesus.

54.   O'Brien Industrial Holdings and its subsidiaries share a common Mission and Values which is published on its website. As there stated, the Mission of O'Brien Industrial Holdings "is to make our labor a pleasing offering to the Lord while enriching our families and society."

55.   O'Brien Industrial Holdings' statement of the company's Values begins with the following: "Integrity. Our conduct is guided by the Golden Rule and the Ten Commandments."

56.   O'Brien Industrial Holdings' "Explanation of Mission & Values" posted on its website begins with a quotation from Ephesians 6:1-9, and proceeds to list the following company goals:

    a.   For all of O'Brien Industrial Holdings' employees to have the ability to own their own home accomplished through each employee's pay and an annual profit sharing bonus;

b.  For all of O'Brien Industrial Holdings' employees to have the ability to send
their children to college, accomplished through a generous company
scholarship program; and

c.  For all of O'Brien Industrial Holdings' employees to have the opportunity to
retire with dignity through participation in a 401(k) profit sharing plan.

57.     O'Brien Industrial Holdings explains its Mission of "enriching society" by stating
that O'Brien Industrial Holdings and its subsidiaries "pledge to tithe on the earnings of the
Companies." Part of the tithing is through the "St. Nicholas Fund," a 501(c)(3) organization
named for the fourth century Bishop of Myra. O'Brien Industrial Holdings asks its employees to
"keep their eyes open" for situations where "a little monetary help may make a big difference to
someone." Employees are to alert the Company's St. Nicholas Committee, which investigates
such charitable referrals and responds to the needs anonymously.

58.     O'Brien Industrial Holdings and its subsidiaries have approximately 105
employees. Approximately 40 of these employees are in the City of St. Louis, and thus the
Company is subject to the employment nondiscrimination section of the Ordinance.

59.     O'Brien Industrial Holdings' employees are covered by a group health insurance
plan, O'Brien Industrial Holdings, LLC Employee Benefit Plan (O'Brien Plan). The plan is
administered by a third party administrator that adjudicates claims and pays benefits as provided
for in the O'Brien Plan. O'Brien Industrial Holdings and Frank O'Brien consider the provision
of employee health insurance—like the Company's profit sharing, retirement plan, scholarship
program, and tithing efforts—an integral component of furthering the Company's Mission and
Values.

60.     Frank O'Brien holds to the teachings of the Catholic Church regarding the

sanctity of human life from conception to natural death. He believes that intentional action to destroy the life of an unborn child is gravely sinful. Frank O'Brien adheres to Catholic Church teaching regarding the immorality of sterilization and artificial means of contraception.

61.     Frank O'Brien believes that he, and therefore his company, O'Brien Industrial Holdings, cannot provide coverage for abortion, contraceptives or sterilization without violating his sincere religious beliefs.

**City of St. Louis**

62.     The City of St. Louis is a Missouri constitutional charter city.

### St. Louis City Ordinance 70459

63.     Ordinance 70459 became effective on or about February 13, 2017.

64.     Ordinance 70459 was drafted by St. Louis alderpersons in collaboration with the National Abortion Rights Action League (NARAL), an organization that stridently opposes the Catholic Church's position on abortion and that seeks the closure of alternatives-to-abortion providers.

65.     In hearings on Board Bill 203, which became Ordinance 70459, the bill's sponsors presented "expert testimony" vilifying the Catholic Church and its opposition to abortion; mischaracterizing the Catholic Church as favoring pregnancy discrimination; criticizing the Church's opposition to contraception as "woefully out of touch"; calling the Church's concern for the unborn "disingenuous"; and labeling the Church an "oppressive religious institution" that shames women for their reproductive decisions.

66.     The Ordinance's prohibitions on discrimination can be divided into two sections: those related to employment and those related to housing and realty.

67.    The employment-related restrictions, found in Section Two (B), outlaw the

following:

(1)  For an employer to fail or refuse to hire, to discharge or otherwise to
discriminate against any individuals with respect to compensation or the terms,
conditions or privileges of employment, because of their reproductive health
decisions or pregnancy status (including childbirth or a related medical condition).
However, nothing in this ordinance shall require a religious institution, corporation,
association, or society to provide reproductive health benefits of any kind;

(2) For an employer to take any adverse employment action against an employee
based on a reproductive health decision by an employee or employee's dependent.
However, nothing in this ordinance shall require a religious institution, corporation,
association, or society to provide reproductive health benefits of any kind;

*   *   *

(5) For an employer, labor organization or employment agency to print or
circulate or cause to be printed or circulated, any statement, advertisement or
publication, or to make any inquiry in connection with prospective employment,
which expresses directly or indirectly any preference, limitation, specification or
discrimination because of reproductive health decisions or pregnancy status
(including childbirth or a related medical condition), unless based upon a bona fide
occupational qualification.

68.    The housing and realty restrictions, found in Section Two (C)(1), outlaw the

following:

(a) For any person, including, without limitation any real estate broker, salesman
or agent, or any employee thereof, to discriminate against any individuals because of
their reproductive health decisions or pregnancy status (including childbirth or a
related medical condition), with respect to the use, enjoyment or transfer, or
prospective use, enjoyment or transfer, of any interest whatsoever in realty, or with
respect to the terms, conditions, privileges or services granted or rendered in
connection therewith, or with respect to the making or purchasing of loans for the
purchase or maintenance of residential real estate or loans in the secondary market, or
the provision of other financial assistance, or with respect to the terms, conditions,
privileges or services granted or rendered in connection with any interest whatsoever
in realty, or with respect to the making of loans secured by residential real estate;

*   *   *

(c) For any real estate broker, salesman or agent, or any employee thereof, or any
other person seeking financial gain thereby, directly or indirectly to induce or solicit,

or attempt to induce or solicit, the transfer of any interest whatsoever in realty, by making or distributing, or causing to be made or distributed, any statement or representation concerning the entry or prospective entry into the neighborhood of a person or persons of person based on said person's reproductive health decision or pregnancy status (including childbirth or a related medical condition);

(d) For any person to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate the sale or rental of, or otherwise make unavailable or deny a dwelling to any persons because of their reproductive health decisions or pregnancy status (including childbirth or a related medical condition);

(e) For any person to discriminate against any other person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of that person's reproductive health decisions or pregnancy status (including childbirth or a related medical condition);

(f) For any person to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on reproductive health decisions or pregnancy status (including childbirth or a related medical condition) or an intention to make any such preference, limitation, or discrimination;

(g) For any person to represent to another person because of reproductive health decisions or pregnancy status (including childbirth or a related medical condition), that any dwelling is not available for inspection, sale, or rental when such dwelling is, in fact, so available;

\*   \*   \*

**Ordinance 70459 extends protected class status not just to a woman making a reproductive decision regarding her own pregnancy, but also to other individuals and corporate entities, including abortion activists, promoters and providers.**

69.     Section One (14) of Ordinance 70459 provides that a "'[r]eproductive health decision' means any decision related to the use or intended use of a particular drug, device, or medical service related to reproductive health, including the use or intended use of contraception or fertility control or the planned or intended initiation or termination of a pregnancy."

70.     The definition of "reproductive health decision" goes far beyond a woman's past or future decision to have an abortion. It includes "any decision" that is "related to" abortion.

The pregnancy being terminated may be a woman's own or it may be the pregnancy of a friend, an acquaintance, or anyone. It is not required that the person complaining of discrimination even know the pregnant woman. A "reproductive health decision" even includes those "decision[s]" made by individual or corporate abortion activists, promoters and providers.

71.     The "decision" may be one made by a husband or other male sexual partner of the woman who has or intends to have an abortion. The Ordinance defines "[a]ggrieved person" as "any person who claims to have been injured by a discriminatory act or practice described" therein.

72.     In forbidding employment discrimination, the Ordinance refers only to "individuals" or "employees." However, in forbidding discrimination in housing or sale or lease of realty, the Ordinance places in a protected class not only "individuals" but also "persons," which the Ordinance defines to include corporations and other business organizations.

73.     In Section Two (C)(1)(c) to (h), regarding the sale and rental of real property, the Ordinance shifts from "individuals" to "persons" in order to protect from discrimination both individuals and corporate entities that make "decision[s] related to" abortion. Thus, the Ordinance forbids Plaintiffs from declining to sell or rent real property to any individual or corporate organization because they promote or provide abortions.

74.     Up until now, the City of St. Louis has forbidden discrimination based on the familiar categories of "race, color, age, religion, sex, familial status, disability, sexual orientation, national origin or ancestry." To this list, Ordinance 70459 adds a new protected class: those who make "reproductive health decision[s]." This includes not just women who makes decisions about their own pregnancies, but also other individuals and corporate entities,

including abortion activists, promoters or providers. Any individual or corporate entity that makes any decision regarding abortion or other reproductive issue is now in a protected class.

**Ordinance 70459 restricts and otherwise chills what Plaintiffs can say and publish regarding abortion and other reproductive issues, in violation of the First Amendment.**

75.     Ordinance 70459 forbids Plaintiffs from speaking freely regarding abortion and other reproductive issues, in violation of the freedom of speech and association guarantees contained in the First Amendment.

76.     Ordinance 70459 contains two speech codes, one for employment discrimination and one for housing discrimination: Sections Two (B)(5) and Two (C)(1)(f). These speech codes prevent Plaintiffs from making employment, housing and realty determinations consistent with their institutional missions, sincere moral and religious beliefs about human life, or both, in violation of the guarantees of the First Amendment to freely speak, publish and associate with others for expressive purposes, including for religious, social, educational, political, economic and cultural purposes.

77.     The speech code restrictions are vague and substantially overbroad, chilling the free speech rights not just of Plaintiffs but also of others not before the Court. The Ordinance's speech code is accordingly unconstitutional on its face and as applied.

**Ordinance 70459 unlawfully requires employers that are not considered religious organizations, including individual religious employers, to provide health care coverage for abortion, contraception and sterilization.**

78.     Except for religious organizations, Ordinance 70459 requires all employers of six or more employees to provide employee health care coverage for abortion, contraception and sterilization. This mandate is prohibited by Missouri law. Mo. Rev. Stat. 191.724 and 376.805.1.

79.     Subsections Two (B)(1) and (2) of the Ordinance require individuals and entities that are not considered religious organizations to provide health care coverage for abortion,

contraception and sterilization. Additionally, whether religious or not, individuals enjoy no

exemption. This is especially evident in that both subsections (B)(1) and (2) conclude as follows:

"However, nothing in this ordinance shall require a religious institution, corporation, association,

or society to provide reproductive health benefits of any kind . . . ."

80.     Subsections Two (B)(6) and Two (C)(1)(j) contain the following narrow

exemption:

> Nothing in this Ordinance shall prohibit a religious institution, corporation,
> association, society, health care facility or educational institution with historic
> religious affiliation from:
>
> i.      Prohibiting the provision of any reproductive health service on property
> owned or leased by it;
>
> ii.     Refusing to provide or pay for any reproductive health service to any
> patient, student or employee; or
>
> iii.    Refusing to provide health insurance coverage to any employee for any
> reproductive health service.

81.     Accordingly, in several places the Ordinance exempts religious organizations

from having to provide health insurance for abortion and other reproductive choices, but it forces

individuals and entities not considered to be religious organizations to cover abortion,

contraception and sterilization in their health plans. This adversely impacts Our Lady's Inn,

O'Brien Industrial Holdings, and Frank O'Brien.

82.     The City of St. Louis could have simply said that *no individuals or organizations*

have to provide health care coverage for abortion. However, Subsections Two (B)(1) and (2) of

the Ordinance require individuals and entities that are not considered to be religious

organizations to provide health care coverage for abortion, contraception and sterilization. If that

were not the case, there would be no need for the repeated insertion of an exemption for religious

organizations. And, if the repeated exception for the stated "benefits" or "coverage" were meant to apply generally, it would not be specifically limited in each instance to religious organizations.

**The religious exemptions are inadequate to save Ordinance 70459.**

83.     Individual employers, no matter how religious or pro-life they may be, are not exempt from the Ordinance's requirements so long as they have six or more employees. Corporate employers who do not qualify as "religious" are also not exempt, no matter how sincere their opposition is to abortion, contraception or sterilization. Accordingly, the Ordinance violates both the federal Equal Protection Clause and state law. *See* Mo. Rev. Stat. 191.724, 376.805.1. Frank O'Brien is a religious employer but as an individual is not exempt. O'Brien Industrial Holdings is religiously motivated as to many of its corporate decisions, but it is not exempt. Our Lady's Inn considers itself religious, but the Ordinance is unclear as to whether it qualifies for the limited and undefined exemption provided to religious organizations.

84.     The only other exception is found in subsection (5) of Section Two (B) of the employer-related restrictions, which contains an exception regarding a "bona fide occupational qualification" (BFOQ). "Bona fide occupational qualification" is not defined, and it appears nowhere else in the Ordinance. By its terms the BFOQ is an exception only to the speech code found in subsection (5), and it is not limited to BFOQs based on religion. Its scope is undefined and wholly without guiding context, and thus is void for vagueness.

85.     The exemptions offered to religious organizations are narrow. They do not exempt religious organizations from declining to employ individuals who support abortion or have made decisions to have an abortion.

**Ordinance 70459 does not conform to the statutes of the State of Missouri.**

86.     Mo. Rev. Stat. 71.010 states that local ordinances must conform to state law. If they do not, the ordinances are unenforceable, null and void.

87.     The requirement for non-exempt employers to provide employee health insurance coverage for abortion, contraception and sterilization does not conform to state law:

     a.  Section 191.724 (Mo. Rev. Stat.) prohibits any governmental entity, public official, or entity acting in a governmental capacity from mandating that an employer or an employee include coverage for abortion, contraception or sterilization in a health plan; and

     b.  Section 376.805.1 (Mo. Rev. Stat.) states that "No health insurance contracts, plans, or policies delivered or issued for delivery in the state shall provide coverage for elective abortions except by an optional rider for which there must be paid an additional premium."

88.     Pursuant to Mo. Rev. Stat. 135.600.1(2), a "maternity home" is "a residential facility located in this state established for the purpose of providing housing and assistance to pregnant women who are carrying their pregnancies to term, and which is exempt from income taxation under the United States Internal Revenue Code." Our Lady's Inn is a maternity home.

89.     If Our Lady's Inn were required to house women who were not pregnant, or to continue to house women who had been pregnant but had an abortion, as the Ordinance requires, Our Lady's Inn would no longer be considered a "maternity home" for purposes of the Maternity Home Tax Credit. Private donations to Our Lady's Inn would also decline if it housed women who had abortions while residing at the home. Finally, the home's charitable mission and purpose for associating would be countermanded, its reputation among supporters damaged, and in time it would be destroyed.

90.     Our Lady's Inn also receives state funding under Missouri's Alternatives to Abortion Act, Mo. Rev. Stat. 188.325. If Our Lady's Inn were to comply with Ordinance 70459,

it would no longer be in compliance with the Alternatives Act, which provides that "[t]he alternatives to abortion services program and the moneys expended under this section shall not be used to perform or induce, assist in the performing or inducing of or refer for abortions. Moneys expended under this section shall not be granted to organizations or affiliates of organizations that perform or induce, assist in the performing or inducing of or refer for abortions."  Mo. Rev. Stat. 188.325.5.

91.     The Alternatives to Abortion Act also states that the "[s]ervices provided under the alternatives to abortion program shall include . . . housing and utilities." Mo. Rev. Stat. 188.325. Ordinance 70459 prohibits Our Lady's Inn from providing housing to women on the basis of the women having chosen not to have abortions. The Ordinance prohibits what state law specifically authorizes. *See* Mo. Rev. Stat. 71.010.

92.     The provisions of Mo. Rev. Stat. 197.032.2 similarly condemn Ordinance 70459: "No person or institution shall be denied or discriminated against in the reception of any public benefit, assistance or privilege whatsoever or in any employment, public or private, on the grounds that they refuse to undergo an abortion, to advise, consent to, assist in or perform an abortion. . . . Any person who shall deny or discriminate against another for refusal to perform or participate in an abortion shall be liable to the party injured in an action at law, suit in equity or other redress."

93.     Ordinance 70459 as a whole does not conform to Missouri law, which states that "[i]t is the intention of the general assembly of the state of Missouri to grant the right to life to all humans, born and unborn, and to regulate abortion to the full extent permitted by the Constitution of the United States, decisions of the United States Supreme Court, and federal statutes." Mo. Rev. Stat. 188.010.

94.     To the extent that the Ordinance contradicts, undermines or does not conform to state law it is unenforceable and null and void.

**The enforcement of Ordinance 70459 is by reference to Ordinance 67119, which is defective and thereby unenforceable. Additionally, Ordinance 67119 provides that as to classes not protected in the Missouri Human Rights Act, the only means of enforcement is by criminal prosecution. Because of the aforementioned defect and because enforcement is only by criminal prosecution, the Ordinance is void for vagueness.**

95.      Section Three of Ordinance 70459 states that its enforcement will be "pursuant to the procedures set forth in Ordinance 67119."  However, Ordinance 67119 makes its various means of enforcement (administrative, civil claim, and criminal prosecution) available only to the classes protected under Ordinance 67119, not to classes created elsewhere. Ordinance 70459 is thereby defective in that it has no means of enforcement.

96.     Ordinance 67119 establishes a City Civil Rights Enforcement Agency composed of an Executive Director and staff. It also establishes a Civil Rights Enforcement Commission composed of the Executive Director and seven volunteer Commissioners. Ordinance 67119, Section One.

97.     Section Nine of Ordinance 67119 specifies prohibited classes in the context of nondiscrimination in employment, housing, public accommodations, and City programs. Never are persons making "reproductive health decision[s]" named as a protected class.  Moreover, never are persons making "reproductive health decision[s]" named as a protected class in Mo. Rev. Stat. Chapter 213 (Human Rights Act).

98.     Section Ten (A) of Ordinance 67119 provides for the receipt of complaints of discrimination. However, when a complaint is received with respect to a class not protected under Chapter 213 and found meritorious, the Executive Director is to refer the matter to the City

Counselor for criminal prosecution. Ordinance 67119, Section Ten (A)(3).  There is no further administrative process.

99.     Section Ten (D) of Ordinance 67119 confirms this sidetracking of complaints concerning classes not covered by Chapter 213. That subsection provides for a civil action in circuit court by the Executive Director to "preserve rights" *only* for rights protected by Chapter 213. And Section Ten (E)(3) provides that, if the Executive Director determines that there is probable cause that unlawful discrimination occurred concerning a protected class outside Chapter 213, the only recourse is to refer the matter for criminal prosecution by the City Counselor.

100.     Section Seventeen of Ordinance 67119 sets forth the only criminal penalty for a discrimination violation, and is thus the criminal law under which the City Counselor is to proceed:

> Any person convicted of violation of this Ordinance shall be punished by [fine or imprisonment].

Section Seventeen is explicit that criminal punishment is for "violation of this Ordinance," not a violation of some other ordinance such as Ordinance 70459. Therefore, Ordinance 70459's mere cross-reference to Ordinance 67119 is defective.

101.     The enforcement of Ordinance 70459 by cross-reference to Ordinance 67119 is confusing and cannot be understood by a person of ordinary intelligence. Pursuant to Section Seventeen of Ordinance 67119, any person convicted of a violation of Ordinance 67119 "shall be punished by a fine of not less than Two Hundred Fifty Dollars ($250.00) nor more than Five Hundred dollars ($500.00), or by imprisonment for not more than ninety (90) days or by both such fine and imprisonment." Because of the dire consequences when conduct is criminalized,

criminal statutes are subject to especially close scrutiny under the doctrine of void for vagueness. Ordinance 70459 is void for vagueness in contravention of the Due Process Clause.

102.    Ordinance 70459 by its plain terms has no geographic limits on its applicability. Plaintiffs have employees and property both inside and outside the City of St. Louis. The extraterritorial sweep of the Ordinance makes it confusing and thus void for vagueness in contravention of the Due Process Clause. The Ordinance is also null and void because its extraterritorial sweep is contrary to the authority granted in Mo. Rev. Stat. 213.135.1.

**Plaintiffs' need for relief**

103.    The impact of chilling and deterring Plaintiffs from exercising their federal constitutional rights and rights under state law constitutes immediate and irreparable harm to Plaintiffs caused by Ordinance 70459.

104.    Ordinance 70459 is causing serious, ongoing hardship to Plaintiffs concerning their employment, and housing and realty decisions, as well as concerning what they can say and publish. They need relief now.

105.    Plaintiffs face a credible threat of prosecution and should not be required to await and undergo an arrest and criminal prosecution as the sole means of seeking relief.

106.    Plaintiffs have no adequate or speedy remedy at law to correct or redress the deprivation of their rights caused by Ordinance 70459.

107.    Unless Ordinance 70459 is declared unlawful and enforcement of it enjoined, Plaintiffs will continue to suffer irreparable injury.

## FEDERAL CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT

### All Plaintiffs

108.    Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

109.    The First Amendment's Freedom of Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits abridging speech.

110.    All acts of the City of St. Louis alleged herein were done and continue to be done under color of state law.

111.    As to employment, Ordinance 70459 directly and currently interferes with Plaintiffs' speech by barring them from "print[ing] or circulat[ing] or caus[ing] to be printed or circulated, any statement, advertisement or publication, or [making] any inquiry in connection with prospective employment, which expresses directly or indirectly any preference, limitation, specification or discrimination because of reproductive health decisions or pregnancy status (including childbirth or a related medical condition), unless based upon a bona fide occupational qualification." Section Two (B)(5).

112.    The other prohibitions contained in Section Two, including but not limited to (B)(1) and (2), also abridge Plaintiffs' free speech rights.

113.    As to housing and realty, Ordinance 70459 directly and currently interferes with Plaintiffs' constitutionally protected speech by making it unlawful "to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based

on reproductive health decisions or pregnancy status (including childbirth or a related medical condition) or an intention to make any such preference, limitation, or discrimination . . . ." Section Two (C)(1)(f).

114.    The remaining prohibitions contained in Section Two, including but not limited to (C)(1)(d), (e), and (g), also abridge Plaintiffs' free speech rights.

115.    The discrimination prohibitions cause Plaintiffs to limit and censor their constitutionally guaranteed speech regarding abortion and the sanctity of life, which expression could otherwise be used as evidence of discrimination under the Ordinance, as well as evidence of a hostile work environment and thus job harassment.

116.    The rights of Plaintiffs, in an employment context, to discuss with their employees and applicants for employment the subject of abortion is protected under the First Amendment.

117.    By barring said speech and expressive conduct, the City has interfered with Plaintiffs' constitutionally protected speech.

118.    Because it is substantially overbroad, the Ordinance chills and otherwise deprives Plaintiffs and third parties not before the Court from engaging in expressive activities concerning abortion guaranteed by the Free Speech Clause. The Ordinance is thereby unconstitutional on its face and as applied.

119.    The content-based restrictions of the City of St. Louis promulgated in the Ordinance are not supported by a compelling governmental interest and are not narrowly tailored to accomplish any compelling governmental interest.

120.    Ordinance 70459 constitutes a prior and on-going restraint on Plaintiffs' speech in violation of the Free Speech Clause.

121.     The First Amendment protects the freedom of speech, including the right of religious groups and others to speak out and to thereby persuade all who will listen to refrain from engaging in conduct that they consider gravely immoral. Ordinance 70459 discriminates against Plaintiffs' speech on the basis of their viewpoints regarding what it describes as "reproductive health decision[s]." Ordinance 70459 is therefore subject to strict scrutiny, which it cannot survive, because it is not narrowly tailored to accomplish any compelling governmental interest.

122.     As a direct and on-going result of the City's abridgment of Plaintiffs' Free Speech rights, as alleged above, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law.

## COUNT II

## VIOLATION OF RIGHT TO EXPRESSIVE ASSOCIATION
## UNDER THE FIRST AMENDMENT

### All Plaintiffs

123.     Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

124.     The First Amendment recognizes and protects the right to freedom of association.

125.     Plaintiffs stress the dignity and sanctity of human life, including opposition to abortion, and they associate with others for the purpose of more effectively expressing that viewpoint. Plaintiffs' insistence on like-mindedness in this common cause among their employees, and in the case of Our Lady's Inn, among employees, tenants and clients, is constitutionally protected to allow them to engage in expressive association.

126.     Ordinance 70459 restricts the freedom of organizations and individuals such as Plaintiffs to form expressive associations of those who share a common commitment to the sanctity of human life. The right to associate necessarily includes the right to exclude from association.

127.     The City of St. Louis violates Plaintiffs' right to freedom of association by denying them the right to organize their staffs, communicate to them, and to circulate written materials in accordance with their beliefs that abortion is a grave moral wrong.

128.     Ordinance 70459 chills, deters and restricts Plaintiffs from organizing their staffs and, in the case of Our Lady's Inn, staff and clientele, in accordance with their beliefs about abortion.

129.     Because it is substantially overbroad, the Ordinance chills and otherwise deprives Plaintiffs and third parties not before the Court from engaging in expressive association guaranteed by the First Amendment to the United States Constitution. It is thereby unconstitutional facially and as applied.

130.     Absent declaratory and injunctive relief against application and enforcement of the Ordinance, Plaintiffs will suffer irreparable harm.

## COUNT III

## VIOLATION OF THE RELIGION CLAUSES OF THE FIRST AMENDMENT
### (*Hosanna-Tabor*)

### Archdiocesan Elementary Schools

131.     This Plaintiff repeats and re-alleges each of the foregoing allegations in this Complaint.

132.    Ordinance 70459 violates the Archdiocesan Elementary Schools' freedom and autonomy under the Religion Clauses of the First Amendment to the United States Constitution.

133.    The Free Exercise and the Establishment Clauses together vest in churches and other religious organizations such as religious schools the autonomy to order their own affairs, to decide for themselves, free from governmental interference, matters of ecclesiastical government, doctrine, the communication of that doctrine and the internal administration of their institution.

134.    Archdiocesan Elementary Schools' leaders have determined that the beliefs and public communications of its ministerial employees, including school principals and teachers of religion, regarding abortion must be consistent with those of the Catholic Church.

135.    Archdiocesan Elementary Schools' teachers of religion, among other employees, are sources of religious instruction to students and are an essential part of transmitting the Catholic faith to the next generation.

136.    Ordinance 70459 contains no exception for the employment of ministerial employees, as required by *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,* 565 U.S. 171 (2012).

137.    Decisions barred by Ordinance 70459—those to "discriminate" against employee ministers and teachers of religion based on reproductive health decisions—are Archdiocesan Elementary Schools' alone to make under the Religion Clauses.

138.    Ordinance 70459 directly and substantially interferes with Archdiocesan Elementary Schools' First Amendment freedom and autonomy to order its own internal affairs in matters involving ecclesiastical government, faith, doctrine, the communication of that doctrine, and the selection of ministers and teachers of religion at its own institutions.

139.     The City has violated, and continues to violate, Archdiocesan Elementary Schools' freedom and autonomy under the Free Exercise and Establishment Clauses.

140.     Absent declaratory and injunctive relief against application and enforcement of the Ordinance, the Archdiocesan Elementary Schools will suffer irreparable harm.

## COUNT IV

### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
### (*Pierce v. Society of Sisters*)

### Archdiocesan Elementary Schools

141.     This Plaintiff repeats and re-alleges each of the foregoing allegations in this Complaint.

142.     Entities engaged in conducting religious schools are protected by the Due Process Clause of the Fourteenth Amendment from a government's unwarranted interference with the rights of parents, and the rights of the school selected by the parents, to direct the upbringing and education of the parents' children.

143.     The Ordinance deprives students' parents of a fair opportunity to procure for their children instruction that they think is important and that they have selected at least in part for religious reasons.

144.     The Fourteenth Amendment protects Archdiocesan Elementary Schools from the deprivation of its property rights without due process of law.

145.     The right to conduct schools in a certain manner is a right under *Pierce v. Society of Sisters,* 268 U.S. 510 (1925). Parents and guardians, as a part of their liberty, may direct the education of their children, including religious education, by selecting schools that are intentionally pro-life.

146.    The Ordinance conflicts with the rights of Archdiocesan Elementary Schools to conduct its schools and the rights of parents to choose schools where their children will receive religious and pro-life instruction. The Ordinance is thereby repugnant to the Fourteenth Amendment.

147.    Absent declaratory and injunctive relief against application and enforcement of the Ordinance, Archdiocesan Elementary Schools will suffer irreparable harm.

## COUNT V

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION – VOID FOR VAGUENESS

### All Plaintiffs

148.    Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

149.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs due process of law.

150.    The Fourteenth Amendment prohibits the City from censoring speech or penalizing association and other behavior based on vague standards. This is especially so where the expression or conduct is subject to criminal sanction.

151.    A law must provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, and the law must provide explicit standards to law enforcement personnel, judges and juries.

152.    Vague laws trap the unwary by not providing fair notice about what is permitted and what is prohibited. Such laws also provide a platform for spurious and agenda-driven complaints and prosecutions. Explicit standards are required to prevent arbitrary and discriminatory application of the law.

32

153.     A vague law is particularly troublesome where First Amendment freedoms are at stake because it chills the exercise of those freedoms by causing citizens to "steer far wider than the unlawful zone" as opposed to when "the boundaries of the forbidden area were clearly marked." *Grayned v. Rockford*, 408 U.S. 104, 108-09 (1972). Laws that interfere with First Amendment freedoms require a high level of specificity, and laws with criminal penalties get special scrutiny.

154.     Ordinance 70459's definition of "reproductive health decision" is both vague and sweeping in its scope: "**any decision related to** the **use or intended use** of a particular drug, device, or medical service related to reproductive health, including the **use or intended use** of contraception or fertility control or the planned or intended initiation or termination of a pregnancy." Ordinance 70459 Section One (14) (emphasis added).

155.     The term "reproductive health decision," which is used throughout the Ordinance, is so broad that it applies not just to a medical decision but also to political speech or activism regarding abortion, the use of abortifacients as "contraception," and even to advocacy for or performance of abortions.

156.     Ordinance 70459 is also vague as to its effect on Plaintiffs' health insurance plans and whether employers in the City can be required to provide coverage for abortion, abortifacients, sterilizations and contraceptives. The exemptions for corporate religious organizations concerning employee health coverage for abortion means that coverage is required by others, including nonreligious corporations and individual employers.

157.     The religious exemption for employee health care coverage for abortion is itself vague, applying to any "religious institution, corporation, association, society, health care facility or educational institution with historic religious affiliation." Ordinance 70459, Section Two

(B)(6). It is impossible to know whether Our Lady's Inn qualifies for the exemption for a

"religious . . . corporation."

158.    Ordinance 70459's means of enforcement is also unconstitutionally vague. The

Ordinance states that:

> An aggrieved person may, not later than one hundred eighty (180) days after an alleged prohibited discriminatory practice has occurred or terminated, file a complaint with the Director of the Civil Rights Enforcement Agency pursuant to the procedures set forth in Ordinance 67119. Such complaints shall be taken, investigated, processed and enforced according to the terms and provisions of Ordinance 67119.

159.    However, Ordinance 67119's enforcement provisions contemplate enforcement

only as to classes protected under Ordinance 67119, not classes protected in other ordinances:

> Whenever a complaint alleges a prohibited discriminatory practice that, if proven true, **would violate this Ordinance**, but does not violate any of the provisions of Section 213 R.S. Mo., the Director shall cause such complaint to be investigated, and if the Director determines that there is probable cause to believe that a prohibited discriminatory practice has occurred, the Director shall refer the matter to the City Counselor for prosecution.
>
> ***
>
> Any person convicted of violation of **this Ordinance** shall be punished by a fine of not less than Two Hundred Fifty Dollars ($250.00) nor more than Five Hundred dollars ($500.00), or by imprisonment for not more than ninety (90) days or by both such fine and imprisonment . . .

Ordinance 67119 Sections Ten (A)(3), Seventeen (emphasis added).

160.    Ordinance 70459 is void for vagueness because it fails to provide adequate notice

to Plaintiffs and third parties not before the Court of how it is enforceable and by what means,

which will lead to arbitrary and agenda-driven enforcement. This is especially so when

enforcement is by criminal sanction.

161.    Ordinance 70459 is also void for vagueness because on its face it contains no

geographical limitations as to its application. Plaintiffs have employees and property both inside

and outside the City of St. Louis, but they cannot know which employees and property are subject to the Ordinance.

162.    Ordinance 70459 is also void for vagueness because in Section Two (B)(5) there is an exemption from a speech code for a "bona fide occupational qualification," yet that term is undefined and the context in which it appears offers no guidance as to its meaning or application.

163.    Ordinance 70459 is void for vagueness, both on its face and as applied to the Plaintiffs, and thus it violates the Due Process Clause of the Fourteenth Amendment.

164.    Absent declaratory and injunctive relief against application and enforcement of the Ordinance, Plaintiffs will suffer irreparable harm.

## COUNT VI

### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

### O'Brien Industrial Holdings and Frank O'Brien

165.    These Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

166.    The Equal Protection Clause of the Fourteenth Amendment requires that government treat equally all persons similarly situated.

167.    This requirement of equal treatment applies to organizations as well as to individuals.

168.    In Ordinance 70459's religious exemptions, the City has excused certain religious organizations from portions of the law.

169.    The Ordinance limits the exemptions to any "religious institution, corporation, association, society, health care facility or educational institution with historic religious affiliation."

170.    The Ordinance does not exempt entities it does not recognize as religious organizations such as O'Brien Industrial Holdings, or individuals such as Frank O'Brien, yet these Plaintiffs are no less motivated by their sincere religious beliefs.

171.    By extending exemptions to religious organizations, but failing to extend them to the religious beliefs held by O'Brien Industrial Holdings and Frank O'Brien, the City has treated these Plaintiffs differently from similarly situated entities. These Plaintiffs share the same sincerely held religious beliefs against abortion.

172.    Ordinance 70459 thus violates the equal rights of O'Brien Industrial Holdings and Frank O'Brien, secured to them by the Equal Protection Clause of the Fourteenth Amendment.

173.    Absent declaratory and injunctive relief against application and enforcement of the Ordinance, O'Brien Industrial Holdings and Frank O'Brien will suffer irreparable harm.

## STATE LAW CAUSES OF ACTION

### COUNT VII

### VIOLATION OF SECTIONS MO. REV. STAT. 191.724 AND 376.805 CAUSES THE ORDINANCE TO BE NULL AND VOID

#### Our Lady's Inn, O'Brien Industrial Holdings and Frank O'Brien

174.    These three Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

175.    Ordinance 70459 requires employer health insurance coverage for abortion, sterilizations and contraceptives.

176.    Although certain entities enjoy a religious exemption from the coverage requirement, that exemption may not apply to Our Lady's Inn, and certainly does not apply to O'Brien Industrial Holdings and Frank O'Brien.

177.    The requirement for employers to provide insurance coverage for abortion directly conflicts with State law and is thereby null and void:

a.    Mo. Rev. Stat. 191.724 prohibits any governmental entity, public official, or entity acting in a governmental capacity from mandating that an employer or an employee include coverage for abortion, contraception or sterilization in a health plan; and

b.    Mo. Rev. Stat. 376.805.1 states that "No health insurance contracts, plans, or policies delivered or issued for delivery in the state shall provide coverage for elective abortions except by an optional rider for which there must be paid an additional premium."

178.    Absent declaratory and injunctive relief against application and enforcement of the Ordinance, these three Plaintiffs will suffer irreparable harm.

## COUNT VIII

### VIOLATION OF MO. REV. STAT. 188.325 AND 135.600 CAUSES THE ORDINANCE TO BE NULL AND VOID

#### Our Lady's Inn

179.    Our Lady's Inn repeats and re-alleges each of the foregoing allegations in this Complaint.

180.    Our Lady's Inn is part of, and its mission is consistent with, Missouri's Alternatives to Abortion Program, an act established in 2007 through Mo. Rev. Stat. 188.325.

The program assists low-income pregnant women in carrying their unborn children to term instead of having abortions, and then in caring for their newborns or placing them for adoption. The program provides services and counseling during pregnancy and following birth for up to one year.

181.    Pursuant to Section 135.600.1(2), a "maternity home" is "a residential facility located in this state established for the purpose of providing housing and assistance to pregnant women who are carrying their pregnancies to term, and which is exempt from income taxation under the United States Internal Revenue Code." Our Lady's Inn is a maternity home.

182.    If Our Lady's Inn is compelled to house women who are not pregnant, or to continue to house women who are pregnant and then have abortions while residing at Our Lady's Inn, as Ordinance 70459 requires, Our Lady's Inn would no longer be considered a "maternity home" for purposes of the Maternity Home Tax Credit. Additionally, private donations to Our Lady's Inn would decline if it housed women while they had abortions.

183.    Our Lady's Inn's participation in, and funding from, the Alternatives to Abortion Program would also be lost if Our Lady's Inn were compelled to comply with the Ordinance and allow residents to remain following abortions.

184.    Ordinance 70459 would also prevent Our Lady's Inn from complying with the Missouri state law to provide "housing and utilities" as part of the Alternatives to Abortion program.  *See* Mo. Rev. Stat. 188.325. Municipalities may not pass ordinances that prohibit what state law specifically authorizes. *See* Mo. Rev. Stat. 71.010.

185.    Our Lady's Inn leases apartment space to on-site or resident supervisors who are required to agree with and espouse Our Lady's Inn's opposition to abortion.

186.     Because the Ordinance does not conform to Mo. Rev. Stat. 188.325 and 135.600, the Ordinance is unenforceable, null and void.

187.     Absent declaratory and injunctive relief against application and enforcement of the Ordinance, Plaintiff Our Lady's Inn will suffer irreparable harm.

## COUNT IX

### ORDINANCE 70459 IS NULL AND VOID
### BECAUSE ITS ENFORCEMENT PROVISION IS DEFECTIVE

#### All Plaintiffs

188.     Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

189.     By its terms, the enforcement of Ordinance 70459 is solely by reference to Ordinance 67119. *See* Section Three ("An aggrieved person may . . . file a complaint with the Director of the Civil Rights Enforcement agency pursuant to the procedures set forth in Ordinance 67119. Such complaints shall be taken, investigated, processed and enforced according to the terms and provision of Ordinance 67119.").

190.     However, the various means of enforcement available in Ordinance 67119 (administrative, civil lawsuit, and criminal prosecution) are only as to those classes protected under 67119, not classes elsewhere created. Ordinance 70459 is thereby defective in that it has no means of enforcement.

191.     Section Nine of Ordinance 67119 lists those classes protected from discrimination in employment, housing, public accommodations, City funded programs and City programs. Persons making "reproductive health decision[s]" are not named as a protected class in Ordinance 67119. Additionally, persons making "reproductive health decision[s]" are not named as a protected class in Mo. Rev. Stat. Chapter 213, Missouri's Human Rights Act.

192.    Section Ten (A) of Ordinance 67119 provides for the receipt of complaints of discrimination. However, when a complaint is filed with respect to a class not protected under Chapter 213 and found meritorious, the Executive Director is to refer the allegation and his or her findings to the City Counselor for criminal prosecution. See Section Ten (A)(3). There is to be no further administrative processing.

193.    This sidetracking of complaints concerning classes not covered by Chapter 213 is further confirmed by Section Ten (D). That subsection provides for a civil action in circuit court by the Executive Director to "preserve rights" *only* for rights protected by Chapter 213. And Section Ten (E)(3) provides that, if the Executive Director determines that there is probable cause that unlawful discrimination occurred concerning a protected class outside Chapter 213, the only recourse is to refer the matter for criminal prosecution by the City Counselor.

194.    Section Seventeen of Ordinance 67119 sets forth the only criminal penalty for a discrimination violation of Ordinance 67119, and is thus the criminal law under which the City Counselor is to proceed: "Any person convicted of violation of this Ordinance shall be punished by [fine or imprisonment]."

195.    The plain language of Section Seventeen is clear that criminal punishment is for "violation of this Ordinance" (emphasis added), not violation of some other ordinance such as Ordinance 70459. Thus, Ordinance 70459's mere cross-reference to Ordinance 67119 is defective. Ordinance 70459 has no means of enforcement and is therefore null and void.

196.    Absent declaratory and injunctive relief against application and enforcement of the Ordinance, Plaintiffs will suffer irreparable harm.

## COUNT X

### MISSOURI RELIGIOUS FREEDOM RESTORATION ACT

### All Plaintiffs

197.    These Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

198.    The Missouri Religious Freedom Restoration Act (RFRA), Mo. Rev. Stat. 1.302, 1.307, applies to all state and local laws, resolutions and ordinances and the implementation of such laws, resolutions and ordinances, whether statutory or otherwise. Mo. Rev. Stat. 1.307.1. RFRA protects "persons," a term defined in Mo. Rev. Stat. 1.020, to include corporations as well as individuals.

199.    Plaintiffs assert RFRA here as a primary claim or cause of action, not as a defense.

200.    RFRA provides that a person is exempt from a generally applicable law that has the effect of restricting that "person's free exercise of religion." A state or local government must honor the exemption unless the government "demonstrates that application of the restriction to the person is essential to further a compelling governmental interest, and is not unduly restrictive considering the relevant circumstances."

201.    Ordinance 70459 has the immediate and continuing effect of restricting Plaintiffs' free exercise of religion.

202.    Although Archdiocesan Elementary Schools likely qualify for a religious exemption under the Ordinance regarding the narrow matter of being required to provide abortion health insurance coverage for employees, that exemption does not clearly apply to Our Lady's Inn, and certainly does not apply to O'Brien Industrial Holdings and Frank O'Brien. All

Plaintiffs oppose including employee health insurance coverage for abortion and abortifacients as a matter of sincerely held religious belief.

203.    Plaintiffs' belief that abortion is a grave moral wrong constitutes religious free exercise, as does their employment of others with similar beliefs. These Plaintiffs, according to Ordinance 70459, are required to put aside their religious beliefs and practices when it comes to making employment, employee benefits and other human resources decisions. For Our Lady's Inn, this also includes housing decisions.

204.    Ordinance 70459 puts pressure on Plaintiffs to violate their sincerely held religious beliefs and practices by threatening them with criminal fines and incarceration.

205.    The restriction on free exercise the City has imposed and continues to impose on Plaintiffs is not in furtherance of a compelling governmental interest and is unduly restrictive considering the relevant circumstances.

206.    Accordingly, the City has violated Plaintiffs' statutory rights as recognized under RFRA.

207.    Absent declaratory and injunctive relief against the application and enforcement of the Ordinance, Plaintiffs will suffer irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

a.   Declare that City of St. Louis Ordinance 70459 is unlawful, invalid, unenforceable, null and void, and otherwise of no force and effect for some or all of the reasons stated above;

b.   Issue an injunction prohibiting the City of St. Louis from enforcing City of St. Louis Ordinance 70459 against Plaintiffs, as well as against others not before the Court where it is facially unlawful;

c.   Award Plaintiffs the costs of this action, reasonable attorney fees and expert fees pursuant to 42 U.S.C. 1988, and as otherwise provided by law; and

d.   Grant such other and further relief as the Court shall deem necessary and just.

THOMAS MORE SOCIETY

By:  /s/ Sarah E. Pitlyk_____
Sarah E. Pitlyk #60670MO
Thomas Brejcha*
Peter Breen*
19 S. La Salle Street, Suite 603
Chicago, IL 60603
Phone: (312) 782-1680
Facsimile: (312) 782-1887
pitlyk@thomasmoresociety.org

*_Pro hac vice_ motion pending

Attorneys for Plaintiffs